IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THOMAS MYERS O/B/O GINNA LEE MYERS, DECEASED, | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| v. | )   Case No. CIV-23-213-SPS |
| MARTIN O'MALLEY,[1] Commissioner of the Social Security Administration, | )<br>)<br>)<br>)<br>) |
| Defendant. | ) |

## OPINION AND ORDER

The plaintiff, Thomas Myers ("Plaintiff"), on behalf of the claimant, Ginna Lee Myers, deceased, ("Claimant"), requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). Plaintiff appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining Claimant was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act

---

[1] On December 20, 2023, Martin J. O'Malley became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Mr. O'Malley is substituted for Kilolo Kiakazi as the Defendant in this action.

"only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

## Claimant's Background

Claimant was born on September 8, 1970, and was 47 years old on the alleged disability onset date. (Tr. 299-307, 318-320). She was 51 years old at the time of the most recent administrative hearing. (Tr. 51). She completed college and had past relevant work experience working as a housekeeper, an executive housekeeper, a groundskeeper, and an ironer. (Tr. 42). Claimant asserted she had been unable to work since April 1, 2018, alleging disability due to issues with blindness, or low vision, neuropathy degenerative eye disease, depression, anxiety, arthritis in left knee and both hands, COPD, and shortness of breath.[3] (Tr. 311, 331, 341).

## Procedural History

Claimant applied for disability insurance benefits pursuant to Titles II and XVI of the Social Security Act on August 19, 2020. (Tr. 299-307, 318-320). Claimant's applications were denied initially and on reconsideration. Following an administrative hearing, ALJ Doug Gabbard issued a written opinion on September 20, 2022, determining Claimant was not disabled. (Tr. 26–44). Claimant passed away later that year (while her request for review was pending at the Appeals Council), and her husband asked to pursue her claims. (Tr. 8-11). The Appeals Council denied review, making the ALJ's written opinion the Commissioner's final decision for purposes of this appeal. (Tr. 1-3); *See* 20 C.F.R. § 404.981.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. At step two, the ALJ found that Claimant had several severe impairments, including degenerative disc disease; arthritis;

---

[3] Claimant filed a motion to amend the onset date on July 20, 2022, to March 1, 2019. (Tr. 331).

loss of central visual acuity/bilateral optic neuropathy, and chronic obstructive pulmonary disease (Tr. 28). The ALJ also found several non-severe impairments. (Tr. 29).

Next, he found that Claimant's impairments did not meet a listing. (Tr. 30). At step four, he found that Claimant retained the residual functional capacity ("RFC") to perform light work with the following limitations:

> occasional climbing of ramps or stairs; no climbing of ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; no walking on uneven surfaces; no constant reading; she should not be required to drive as part of her work duties; and she must avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, other pulmonary irritants, and hazards such as open flames, unprotected heights, and dangerous moving machinery.

(Tr. 41).

The ALJ found that although Claimant was unable to perform her past relevant work, this RFC allowed her to perform other jobs that existed in significant numbers in the national economy. (Tr. 41-44).

**Review**

Claimant contends the ALJ erred when assessing the medical opinions of record causing error at step five. (Pl. Br. at 4). The Court agrees and the decision of the ALJ must therefore be reversed.

The relevant evidence before the ALJ reflects that Claimant suffered from toxic optic neuropathy, chronic obstructive pulmonary disease ("*COPD*") that was eventually diagnosed as emphysema, major depressive disorder, and anxiety with panic disorder and agoraphobia. (Tr. 882, 999, 1866, 2173, 2133, 2563). In 2018, Claimant experienced a sudden vision change and was diagnosed with central scotomas in both eyes. (Tr. 882, 2567). Her visual field testing demonstrated the right scotoma was slightly larger in the right eye. (Tr. 2567). Claimant described

the area as a blind spot in her vision that did not adjust to light and looked bright when she looked straight ahead. (Tr. 818). This caused light sensitivity, eye pain, and headaches. (Tr. 818, 904, 1155). She could not see faces, traffic lights or signs, and stopped driving. (Tr. 65, 66, 370, 371, 827, 1872).

In November of 2020, the agency's exam verified these findings. Allison Hanson, OD, performed a Goldmann visual field test that documented Claimant's bilateral scotomas, with the right eye's scotoma extending slightly wider than the one on the left. (Tr. 1152-1153). A scotoma is an area in someone's vision with reduced light sensitivity.[4] In Claimant's left eye, the scotoma extended 50 degrees to the right, and 60 degrees to the left. (Tr. 1153). In her right eye, it extended nearly 70 degrees to the right and 50 degrees to the left. *Id*. The Goldmann visual field test documented two large areas in the center of Claimant's vision that could only see a single range of light intensity. *Id.* Claimant's specialists also documented dense bilateral central scotomas in Claimant's field of vision when conducting a 24-2 field of vision test. (Tr. 882).

Dr. Hanson marked the subjective light decibel range of the light intensity Claimant perceived (III) in the circled area, delineating the scotoma in Claimant's visual field.[5] In the agency's examination results, Dr. Hanson marked "a0" as the minimum amount of light that Claimant required to perceive in the central vision defect for both Claimant's left and right eye. Marking "0" on an individual's results means an individual's eyes have low light sensitivity (as opposed to being highly sensitive and reactive to light and requiring only a small intensity of light to react). Most people can see more than one range of light intensity.[6] A result of zero means the

---

[4] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1255967/(*last accessed* September 8, 2023) (Pl. Br. at 2).
[5] *Id.*
[6] *See* https://eyerounds.org/tutorials/VF-testing/#Goldmann *presenting* figure 8 as a normal example of a Goldmann visual field test. (*Last accessed* September 8, 2023), *Id.*

dimmest light Claimant could perceive through her bilateral scotoma was the most the equipment could produce, either 4,000 or 10,000 apostilbs of light, depending on which equipment was used.[7] Generally, a healthy eye can respond to a wide range of apostilbs. The Goldmann test ranges in stimuli from 0.08 apostilbs to 10,000.[8] In Claimant's case, testing demonstrated large central visual field deficits that were not light sensitive. Normally, the area with the highest sensitivity to light is at the fovea and reduces towards the periphery.[9] Yet, in Claimant's case, the agency's own examination results demonstrated large areas with low light sensitivity in both eyes directly central, supporting the dense, bilateral scotoma that her eye specialists noted, and the central "blind spot" in her vision to which Claimant testified.

Claimant's eye issues were compounded by the fact that her corrected vision was 20/150, meaning that even with corrected lenses and using both eyes, Claimant had to be twenty feet away from things that people with normal vision could see from 150 feet away. (Tr. 2489). Finally, Claimant's corrected near visual acuity was 20/80, meaning that even at 40 centimeters away, Claimant's vision was impaired. (Tr. 2490). Claimant stated she required a magnifying glass to read. (Tr. 394).

Finally, Claimant suffered from moderately severe COPD and emphysema as identified by pulmonary function testing by the agency's examination. (Tr. 1727). Claimant's FEV1/FVC ratio reveal this level of disease. *Id.* Her symptoms reflect chronic shortness of breath with exertion. (Tr. 2562). When provided medication for anxiety after an altercation with her spouse, Claimant experienced acute hypoxic failure. (Tr. 2497-2498). The medical records frequently documented low or borderline oxygen levels and respiratory symptoms. (Tr. 496, 500, 504, 513, 522, 527, 531,

---

[7] *See* https://www.ncbi.nlm.nih.gov/books/NBK585112/ (*last accessed* September 8, 2023), *Id.*
[8] *See* https://eyerounds.org/tutorials/VF-testing/ (*last accessed* September 8, 2023) (Pl. Br. at 2).
[9] *See* https://www.ncbi.nlm.nih.gov/books/NBK585112/ (*last accessed* September 8, 2023), *Id.*

541, 545, 546, 562, 576, 799, 804, 906, 909, 1155, 1866, 1902, 2497-2498, 2542, 2562, 2614, 2631).

An administrative hearing was held before an administrative law judge ("*ALJ*") on August 9, 2022. (Tr. 51-81). Claimant testified she helps her disabled husband out of bed, she does the wash and occasionally goes shopping (once per month). She said that she cannot see well due to macular degeneration; cannot see faces or signs or traffic lights; cannot read or write; and cannot drive. She can see around her with her glasses on but cannot see faces or recognize people she knows. Her vision became considerably worse in 2018 and she quit driving. Her husband then began driving for her. She testified she used an inhaler for her breathing 5 times daily. She takes a lot of medications for anxiety and depression, and her kidneys. The mental medications work only somewhat. She hardly leaves the house because she cannot see anything and is paranoid someone might harm her. She has memory issues and cannot remember what she did yesterday. *Id.*

The ALJ found Claimant's degenerative disc disease, loss of central visual acuity (bilateral) due to optic neuropathy, and COPD were severe impairments. (Tr. 28). He found the Claimant's major depressive disorder, anxiety, and substance abuse were non-severe impairments. (Tr. 29).

At step four, the ALJ propounded several hypotheticals to the VE. (Tr. 73-80). In his first hypothetical to the VE, the ALJ's exchange with the VE was as follows:

ALJ:   [a]ssume a hypothetical person the same age, education, and work experience as Ms. Meyers who can perform light work with occasional climbing of ramps or stairs. No climbing of ladders, ropes, or scaffolds. Occasional balancing, stooping, kneeling, crouching, and crawling. No walking on uneven surfaces. No constant reading. She should not be required to drive as part of her work duties. And she must avoid even moderate exposure to fumes, odors, dusts, gasses, poor ventilation, and other pulmonary irritants and hazards such as open flames, unprotected heights, and dangerous machinery. My question is, could this hypothetical person find, or perform Ms. Meyers past work?

VE:   No

ALJ:   Okay. What about other work in the national economy?

The VE then named several other jobs that would be available to Claimant in the national economy. Next, the ALJ proceeded to ask four additional hypotheticals. After adding more limitations which included that the hypothetical person not be required to read, do any fine detail work, and be limited to only simple work with occasional contact with others, the VE found there were no jobs available.

Counsel for Claimant was allowed to ask the VE the following question:

COUNSEL: Sir, if we added the loss of central vision acuity to the hypotheticals in their entirety, how would that affect the answers for the hypotheticals?

VE:     I'm sorry?

COUNSEL: If this person had central vision loss, couldn't see right in front of them, how would that affect your answers to all hypotheticals?

VE:     Pardon me. It would preclude the individual from employment.

Moving on to step five, the ALJ discounted several of the hypotheticals and found Claimant could perform the jobs of Garment Sorter, Cafeteria Attendant, and a Mail Clerk. (Tr. 32, 43).

Claimant contends the ALJ never properly assessed the extent of her vision limitations in either his medical summary, or when analyzing the medical opinions. The record reveals that both Drs. Werner and Bell only cite Claimant's bilateral central visual acuity, stating it is 20/150 and that Claimant's right eye is more limited than her left. (Tr. 118, 161). Neither cite Dr. Hanson's consultative examination conducted on behalf of the agency that explains the extent of Claimant's bilateral scotoma with reduced light sensitivity. (Tr. 1152-1153).

Likewise, neither cite Claimant's eye specialists that explain dense bilateral scotoma were found when conducting a 24-2 visual field of vision test. (Tr. 882). While the ALJ acknowledges

the medical record states Claimant's vision was non-reactive to light, which prompted her to be sent to a specialist, and also acknowledges the specialist's findings, the ALJ does not analyze how these findings affect Claimant's decisional RFC. (Tr. 35-36).

The medical evidence establishes "dense bilateral central scotoma" that, as noted by the ALJ, are nonreactive to light. (Tr. 882). The field of vision tests assessed by the agency demonstrate objectively how large these dense, non-light reactive blind spots appeared in Claimant's field of vision. (Tr. 1152-1153). The testing further demonstrates how sensitive to light Claimant's eye was within the blind spots. *Id.* The blind spots, marked as a0 indicate Claimant required a minimum of 4,000-10,000 apostilbs of light within that area to react, depending on the machine used to test the individual's light sensitivity, whereas a healthy eye can react to a wide range of light intensity. *Id.* Claimant's test indicating her eyes required 4,000-10,000 apostilbs to detect light within the large bilateral blind spots demonstrate she required the most light to see that the Humphrey visual field test looks for within the outlined scotomas in each eye, demarcated by points and an outline. *Id.* Nonetheless, despite acknowledging Claimant suffered from stable, bilateral non-light reactive scotomas central in her vision since 2018, the ALJ did not explain why he rejected this significant, probative evidence or how the decisional RFC limiting Claimant to "no constant reading" and no driving as part of her work duties accommodated the limitations and restrictions that flowed from this severe impairment assigned at step two. (Tr. 39).

The ALJ's analysis relying on the agency's reviewers' opinions finding that Claimant's visual acuity was not below 20/200 does not account for her central vision deficits. (Tr. 30, 41); *Briggs ex rel. Briggs v. Massanari,* 248 F.3d 1235, 1239 (10th Cir. 2001) (error fatal where ALJ failed to explain why he rejected the significant probative evidence without proper explanation)*; Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir. 2004). The vocational expert specifically found

an individual who suffered from central vision loss would be unemployable. (Tr. 79); *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) (it is error to ignore evidence that would support a finding of disability while highlighting the evidence that favors a finding of nondisability). While the ALJ questioned the extent of central vision loss that would disqualify a person from work, in this case, objective testing exists which demonstrates the severe degree to which Claimant's scotomas blocked her central vision. (Tr. 1152-1153).

Further, the ALJ does not explain how the specific medical evidence in the record supports his limitations considering the extent to which the dense scotomas not only affect Claimant's light reactivity, but were centrally located in her vision. *Id.; SSR* 96-8p (an RFC assessment should include all the evidence and ordinarily is the maximum remaining ability to do sustained work activities in an ordinary work setting). When a medical source assesses functions that limit a claimant's work activity, the ALJ must explain why that functional limitation does not appear in the RFC. *Frantz v. Astrue*, 509 F.3d 1299, 1302-1303 (10th Cir. 2007); *Givens v. Astrue*, 251 Fed. Appx. 561, 568 (10th Cir. 2007). Because the ALJ's assigned RFC fails to comply with *SSR* 96-8p, there is no assurance Claimant can perform the jobs assigned. *SSR* 96-8p requires the adjudicator to provide a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts, including laboratory findings, and nonmedical evidence. The adjudicator must explain how any material inconsistencies in the evidence were considered and resolved. *Id.* Here, the ALJ does not support the limitations found in his RFC with the required evidence. "When the ALJ has failed to comply with *SSR* 96-8p because he has not linked his RFC determination with specific evidence in the record, the court cannot adequately assess whether relevant evidence supports the ALJ's determination." *Jagodzinsky v. Colvin,* 2013 WL 489101 *2

(D. Kan. Sept. 11, 2013) (unpublished), *citing Brown v. Comm'r of the Soc. Sec. Admin.* 245 F. Supp. 2d 1175, 1187 (D. Kan. 2003).

The decision of the Commissioner must accordingly be reversed, and the case remanded to the ALJ for further analysis as discussed above.  If on reconsideration the ALJ finds that any changes must be made to the claimant's RFC, he should then redetermine what work, if any, the Claimant could have performed and ultimately whether she was disabled.

## Conclusion

The Court finds that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. Accordingly, the Court finds the decision of the Commissioner is hereby REVERSED and the case REMANDED for further proceedings consistent herewith.

**IT IS SO ORDERD this 8th day of May, 2024.**

_____
**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**